

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

OCT - 6 2003

DAVID J. MALAND, CLERK
BY
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| IN RE ELECTRONIC DATA SYSTEMS CORPORATION SECURITIES LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL CASES | CASE NO. 6:03-MD-1512<br>LEAD CASE 6:03-CV-110<br>("SECURITIES") |

NEW JERSEY'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES..................................................................................iii

I.      INTRODUCTION................................................................................1

II.     SUMMARY OF THE COMPLAINT ................................................4

        A.      The NMCI Contract...................................................................4

        B.      Overview of the Fraudulent Scheme ....................................5

        C.      Progress On The NMCI Contract Suffers From Serious
                Problems And Delays ..............................................................6

                1.      Legacy Software .........................................................7

                2.      Inability To Pass Navy Testing Requirements .........7

                3.      Failure To Provide Remote And Secure Web Access................8

        D.      Defendants' Knowledge And Cover-Up Of The Fraud.........8

        E.      The Fraud Begins To Unravel ..............................................10

III.    STANDARDS APPLICABLE TO MOTIONS TO DISMISS.........14

IV.     ARGUMENT......................................................................................14

        A.      New Jersey Has Stated A Claim For Violation Of § 10(b)..................14

                1.      The Complaint Alleges Facts Indicating Conscious
                        Misbehavior or Severe Recklessness .....................15

                        a.      Defendants' Knowledge Of The Problems Affecting
                                The Progress On The NMCI Contract Supports A
                                Strong Inference Of Scienter.....................................15

                        b.      Defendants' Violation Of GAAP Further Supports A
                                Strong Inference Of Scienter.....................................18

                        c.      The Sheer Magnitude Of The Charge And
                                Seriousness Of The Internal Control Deficiencies
                                Support A Strong Inference Of Scienter.....................24

                d.     New Jersey's Reliance On Admissions Following Disclosure Of The Fraud Is Appropriate To Support A Strong Inference Of Scienter ....................................................... 26

       2.     New Jersey Has Properly Pled Loss Causation ....................................... 28

       3.     Reports Of Problems And Delays With The NMCI Contract Did Not Reveal Defendants Overstated Revenues And Earnings Or Had Significantly Deficient Internal Controls .................................................................... 32

  B.     New Jersey Has Stated A Claim For Violation Of § 20(a) ................................. 34

  C.     Should The Court Be Inclined To Dismiss The Complaint, New Jersey Requests Leave To Amend ............................................................. 35

V.     CONCLUSION ........................................................................................................... 37

## TABLE OF AUTHORITIES

<u>Case</u>                                                                                          <u>Page</u>

*ABC Arbitrage Plaintiffs Group v. Tchuruk,*
   291 F.3d 336, 353 (5th Cir. 2002) ................................................................. 19

*Abell v. Potomac Ins. Co.,*
   858 F.2d 1104 (5th Cir. 1988) ), *vacated and remanded on other grounds by,*
   *Fryar v. Abell,* 492 U.S. 914 (1989)............................................................. 31

*Abrams v. Baker Hughes, Inc.,*
   292 F.3d 424 (5th Cir. 2002) ..................................................................... 27

*Aldridge v. A.T. Cross Corp.,*
   284 F.3d 72 (1st Cir. 2002)....................................................................... 22

*Anderson v. First Sec. Corp.,*
   249 F. Supp. 2d 1256 (D. Utah 2002) .......................................................... 31

*Arduini/Messina Partnership v. Nat. Med. Fin. Services Corp.,*
   74 F. Supp. 2d 352 (S.D.N.Y. 1999)............................................................ 31

*Basic v. Levinson,*
   485 U.S. 224 (1988)................................................................................ 14

*Broudo v. Dura Pharm., Inc.,*
   339 F.3d 933 (9th Cir. 2003) ..................................................................... 29

*Calhoun v. Hargrove,*
   312 F.3d 730, 733 (5th Cir. 2002)............................................................... 14

*Caremark, Inc. v. Coram Healthcare Corp.,*
   113 F.3d 645 (7th Cir. 1997) ..................................................................... 30

*Chalverus v. Pegasystems, Inc.,*
   59 F. Supp. 2d 226 (D. Mass. 1999) ............................................................ 16

*Coates v. Heartland Wireless Comm., Inc.,*
   100 F. Supp. 2d 417 (N.D. Tex. 2000)......................................................... 27

*Coates v. Heartland Wireless Commans., Inc.,*
   26 F. Supp. 2d 910 (N.D. Tex. 1998)........................................................... 35

*Denny v. Barber,*
   576 F.2d 465 (2d Cir. 1978) ...................................................................... 28

*DiLeo v. Ernst & Young,*
    901 F.2d 624 (7th Cir. 1990) ................................................................. 28

*Dussouy v. Gulf Coast Inv. Corp.,*
    660 F.2d 594 (5th Cir. 1981) ................................................................. 35

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,*
    343 F.3d 189 (2d Cir. 2003) ................................................................. 31

*Eminence Capital, L.L.C. v. Aspeon, Inc.,*
    316 F.3d 1048 (9th Cir. 2003) ............................................................... 35

*Florida State Board of Admin. v. Green Tree Financial Corp.,*
    270 F.3d 645 (8th Cir. 2001) ................................................................. 24

*Foman v. Davis,*
    371 U.S. 178 (1962) .............................................................................. 35

*Ganino v. Citizens Utils. Co.,*
    228 F.3d 154 (2d Cir. 2000) ................................................................. 32

*Gebhardt v. ConAgra Foods, Inc.,*
    335 F.3d 824 (8th Cir. 2003) ................................................................. 29

*Goldstein v. MCI WorldCom,*
    340 F.3d 238 (5th Cir. 2003) ........................................................... 27, 36

*Haack v. Max Internet Communs., Inc.,*
    No. 00-CV-1662-G, 2002 WL 511514 (N.D. Tex. Apr. 2, 2002) ............ 14, 34

*Howard v. Everex Sys.,*
    228 F.3d 1057 (9th Cir. 2000) ......................................................... 23, 34

*Huddleston v. Herman & Maclean,*
    640 F.2d 534 (5th Cir. 1981) ................................................................. 29

*In re Accelr8 Tech. Corp. Sec. Litig.,*
    147 F. Supp. 2d 1049 (D. Colo. 2001) .................................................... 22

*In re Ancor Communs.,*
    22 F. Supp. 2d 999 (D. Minn. 1998) ....................................................... 16

*In re Azurix Corp. Sec. Litig.,*
    198 F. Supp. 2d 862 (S.D. Tex. 2002) .................................................... 27

*In re Complete Mgmt. Inc. Sec. Litig.*,
    153 F. Supp. 2d 314 (S.D.N.Y. 2001)................................................................24

*In re Enron Corp. Sec. Derivative & ERISA Litig.*,
    235 F. Supp. 2d 549 (S.D. Tex. 2002)..............................................................34

*In re First Merchants Acceptance Corp. Sec. Litig.*,
    No. 97 C 2715, 1998 WL 781118 (N.D. Ill. Nov. 4, 1998).............................24

*In re Grand Casinos Sec. Litig.*,
    988 F. Supp. 1273 (D. Minn. 1997).................................................................26

*In re Landry's Seafood Restaurants, Inc.*,
    No. H-00-1948, 2001 WL 34115784 (S.D. Tex. Feb. 20, 2001).....................14

*In re Merrill Lynch Co., Inc.*,
    No. 02 MDL 1484 MP, 2003 WL 21500293 (S.D.N.Y. June 30, 2003) .........31

*In re NetSolve, Inc.*,
    185 F. Supp. 2d 684 (W.D. Tex. 2001) ...........................................................16

*In re Raytheon Sec. Litig.*,
    157 F. Supp. 2d 131 (D. Mass. 2001).......................................................19, 26

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ..............................................................................26

*In re Sec. Litig. BMC Software, Inc.*,
    183 F. Supp. 2d 860 (S.D. Tex. 2001)..............................................................28

*In re Secure Computing Corp.*,
    184 F. Supp. 2d 980 (N.D. Cal. 2001)..............................................................22

*In re Sprint Corp. Sec. Litig.*,
    232 F. Supp. 2d 1193 (D. Kan. 2002) ..............................................................31

*In re Sunterra Corp. Sec. Litig.*,
    199 F. Supp. 2d 1308 (M.D. Fla. 2002) ...........................................................28

*In re Triton Energy LTD. Sec. Litig.*,
    No. 5:98-Civ-256, 2001 WL 872019 (E.D. Tex. Mar. 30, 2001) ........16, 18, 22

*In re Unicapital Corp. Sec. Litig.*,
    149 F. Supp. 2d 1353 (S.D. Fla. 2001)........................................................32, 33

*Krogman v. Skerrit*,
    No. 3:98-CV-2895, 1999 WL 1455757 (N.D. Tex. July 21, 1999) .................................. 29

*Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*,
    238 F.3d 363 (5th Cir. 2001) ...................................................................................... 35

*McNamara v. Bre-X Minerals Ltd.*,
    57 F. Supp. 2d 396 (E.D. Tex. 1999) ..................................................................... 25, 35

*Nathenson v. Zonagen Inc.*,
    267 F.3d 400 (5th Cir. 2001) ............................................................................ 14, 15, 16

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ....................................................................................... 28

*Phillips v. LCI Int'l, Inc.*,
    190 F.3d 609 (4th Cir. 1999) ..................................................................................... 30

*Posner v. Coopers & Lybrand*,
    92 F.R.D. 765 (S.D.N.Y. 1981) ................................................................................. 28

*Rehm v. Eagle Fin. Corp.*,
    954 F. Supp. 1246 (N.D. Ill. 1997) ...................................................................... 18, 24

*Robbins v. Koger Props. Inc.*,
    116 F.3d 1441, 1447 (11th Cir. 1997).......................................................................... 30

*Robertson v. Strassner*,
    32 F. Supp. 2d 443 (S.D. Tex. 1998)........................................................................... 30

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) ......................................................................................... 24

*STI Classic Fund v. Bollinger Indus., Inc.*,
    No. 3-96-CV-823-R, 1996 WL 885802 (N.D. Tex. Oct. 25, 1996)................................ 16

*Schiller v. Physicians Res. Group Inc.*,
    342 F.3d 563 (5th Cir. 2003) ...................................................................................... 35

*Urbach v. Sayles*,
    779 F. Supp. 351 (D.N.J. 1991) .................................................................................. 28

*Williams v. WMX Techs.*,
    112 F.3d 175 (5th Cir. 1997) ...................................................................................... 14

*Zuckerman v. Foxmeyer Health Corp.*,
    4 F. Supp. 2d 618 (N.D. Tex. 1998)........................................................................ 29, 30

<u>Statutes, Rules & Regulations</u>

15 U.S.C.
    § 78t(a)............................................................................................................................ 34
    § 78u-4(b)(1)-(2) ........................................................................................................... 15

Federal Rules of Civil Procedure
    Rule 15(a) ........................................................................................................................ 35

I.    INTRODUCTION

This is a straight-forward case of a company intentionally misstating its progress on its most important contract, thereby overstating its revenues by hundreds of millions of dollars. The facts underlying Lead Plaintiff's Amended Consolidated Class Action Complaint (the "Complaint") have been the past subject of Congressional hearings and are currently the subject of an ongoing formal Securities and Exchange Commission ("SEC") investigation.[1]  When the truth was disclosed, the price of the Company's common stock plummeted, causing investors to suffer hundreds of millions of dollars in losses.

Between February 7, 2001 and September 18, 2002, Electronic Data Systems ("EDS") recognized approximately $1.6 billion in revenue from a contract with the United States Navy, which provided for the Company to replace the existing computer network used by the Navy and the Marine Corps with a state-of-the art "intranet."  EDS, however, did not recognize revenues based upon the amount it actually billed to the Navy for the work performed; instead, it used "percentage of completion" accounting, which, under limited circumstances, permits companies to record revenue based upon their progress toward completion of the contract, rather than wait until the contract is completed.  When used properly, percentage of completion accounting provides investors with a realistic portrait of a company's revenues and earnings.  When misapplied, however, percentage of completion accounting provides a vehicle for companies to overstate their revenues by misrepresenting their progress toward completion of the relevant contract.  In the present case, EDS used percentage of completion accounting to represent that it had completed 23% of the work necessary on the Navy contract, when in fact it had failed to compete even 5% of

---

[1]  Lead Plaintiff in this case is the Department of the Treasury of the State of New Jersey and its Division of Investment, on behalf of Common Pension Fund A ("New Jersey").

the work required. When the truth was finally disclosed, EDS was forced to take a charge of more than $300 million to account for its overstatement.

This is not a case of mere negligence or poor judgment – Defendants knew that EDS had not even come close to approaching 23% completion of the Navy contract, and were therefore not justified in recognizing approximately $1.6 billion in revenue during the Class Period. As detailed in the Complaint, this knowledge stemmed from:

- learning in the first quarter of Fiscal 2001, and continuing throughout the period of the fraud, that EDS was unable to transition pre-existing software to the new intranet being installed;

- knowledge that, in September 2001, the Navy deferred approximately $628 million in orders under the contract because of EDS' inability to satisfy the Navy's testing requirements;

- a May 6, 2002 Navy e-mail detailing EDS' continued inability to meet the contract's requirements, including its failure to: (i) install necessary software on the new intranet, requiring the continued use of old computer terminals; (ii) provide remote access service for 61% of Navy users testing this function; or (iii) provide acceptable secure web access through the new system.

These severe problems should have prevented EDS from recognizing any revenue on the Navy contract until the products were both delivered and *accepted* by the Navy. Instead, EDS simply recognized revenue in an amount equal to its costs in providing products to the Navy, regardless of their defects or the lack of Navy acceptance, or the losses that EDS incurred as a result of these defects. *In other words, the more money that EDS spent on the Navy contract, the more revenue it recognized.* The culmination of this effort to inflate the Company's revenues was documented in an April 25, 2002 EDS e-mail, in which the Company adopted a "scorched earth seat rollout" policy, pursuant to which EDS simply delivered as much equipment to the Navy as possible, and recognized revenue on these deliveries regardless of the product's functionality or the Navy's acceptance. In June 2002, the House Committee on Appropriations put a halt to EDS'

scorched earth policy, and prohibited further orders until EDS demonstrated that it had performed at least 5% of the necessary work under the contract. Not until months later did the Company disclose that it had actually lost hundreds of millions of dollars on the Navy contract based upon its inability to deliver satisfactory products in a timely manner. Additionally, after terminating the Defendants Richard Brown ("Brown") and James Daley ("Daley") from their positions of Chief Executive Officer and Chief Financial Officer, respectively, and EDS revealed "significant deficiencies" in its ability to estimate revenues and costs with respect to the Navy contract. These significant deficiencies not only required a complete overhaul of the Company's internal controls, but also revealed that the Company had never been entitled to recognize revenue under the percentage of completion method. Not surprisingly, the SEC has issued a Formal Order of Investigation to EDS concerning these disclosures.

The Complaint details the extent of EDS' misstatements of its revenues throughout the Class Period, the reasons why these statements were false and, most importantly, Defendants' knowledge of or, at the very least, severe recklessness in failing to know the extent of these misstatements. Most importantly, the Complaint principally relies not upon vague internal reports or anonymous sources for its allegations, but upon clearly defined and verifiable information, including internal e-mails and proceedings of the United States Congress. Further, contrary to Defendants' assertions, the disclosure of the misstatements alleged in the Complaint clearly "touch upon" the substantial drop in the price of EDS' common stock once the fraud was revealed, thereby satisfying even the most stringent standard for pleading loss causation adopted by any court. Indeed, despite Defendants' attempt to hide the truth concerning the Navy contract in its September announcement of a revenue and earnings shortfall, investment analysts immediately recognized that EDS' use of the percentage of completion method of accounting on

its major contracts, including the Navy contract, was one of the primary contributors to the Company's woes, driving the stock to lose half its value.

This is not a case of accounting estimates gone awry. It is a case of intentional and severely reckless misconduct, undertaken for the purpose of inflating EDS' revenues by hundreds of millions of dollars. The Complaint rests upon a firm foundation of detailed information, which satisfies the requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Defendants' Motion to Dismiss should therefore be denied.

II.    SUMMARY OF THE COMPLAINT

A.    The NMCI Contract

This case stems from EDS' inflation of its revenues in connection with its $6.9 billion Navy Marine Intranet Contract (the "NMCI Contract") – the largest government outsourcing contract in history. ¶28.[2] EDS provides comprehensive information technology solutions to large companies and governmental entities, including segments of the United States Government. ¶2. On October 6, 2000, the United States Navy awarded EDS, the NMCI Contract, pursuant to which EDS agreed to replace and link approximately 350,000 desktop computers, workstations or seats scattered over 300 military bases worldwide, into a single, highly secure intranet network over a 3 to 5 year period. The NMCI Contract was the most significant engagement performed by EDS during the Class Period, and according to the Company's website, it ranks as the fourth most significant event in EDS' history. Under the terms of the contract, the Navy was not required to pay EDS the full amount of the contract price until it was satisfied with the performance of the equipment and services provided. ¶3.

_____

[2] All "¶" references are to the Complaint filed on July 7, 2003, unless otherwise indicated.

B.   Overview of the Fraudulent Scheme

During the period from February 7, 2001 through September 18, 2002 (the "Class Period"), EDS reported revenues totaling $1.6 billion from the NMCI Contract – or approximately 23% of the total revenues that EDS would be owed if it fully performed its obligations under the contract. EDS, however, never billed the Navy for this enormous sum, nor was it entitled to this payment under the terms of the contract.  Instead, rather than wait until it had substantially completed its performance under the contract to recognize revenue, as is traditionally required under generally accepted accounting principles ("GAAP"), EDS recognized revenue as work was performed, using the percentage of completion method of accounting.  ¶2.  Thus, by recording 23% of the revenue to which it was entitled for performance under the contract, EDS represented that it had completed 23% of the work to be performed.  ¶3.

GAAP permits the use of percentage of completion for long-term contracts only under certain limited circumstances, all of which EDS warranted to be present when it recorded revenues under the NMCI Contract.   First, companies are permitted to use percentage of completion accounting only when the estimates of the costs to complete the contract are reasonably dependable.  ¶48.  Where a company is unable to produce reliable cost estimates, or where its past history demonstrates an inability to produce such estimates, then use of the percentage of the completion method is not permitted.  ¶50.  Second, GAAP proscribes the use of the percentage of completion method where the company does not have adequate assurance that it will break-even or make a profit on the contract.  See ¶¶47, 48.  Third, and most importantly, companies may only recognize revenue using the percentage of completion method to the extent that they have completed work on the relevant contract.  ¶¶46, 48.

EDS falsely represented that it complied with each of these requirements when recognizing revenue from the NMCI Contract throughout the Class Period.  Specifically, EDS

simply recognized revenue throughout the Class Period in an amount equal to the costs that the Company incurred on the NMCI Contract, despite Defendants' knowledge that these costs far exceeded the Company's progress toward completion.[3]  As detailed below, Defendants not only knew that EDS was experiencing substantial cost overruns on the NMCI Contract, but that, because of these cost overruns and delays, EDS had not even approached completion of 23% of the NMCI Contract, as reflected in its financial statements.

      C.     Progress On The NMCI Contract Suffers From
                 Serious Problems And Delays

Although the price of EDS common stock rose approximately 10% on the day the Company announced that it had been awarded the NMCI Contract, Defendants knew that the likelihood of ever achieving a profit on this contract, or even breaking even, was doubtful at best. When bidding for the contract, EDS computed only a 4% profit margin for the Company – nearly half the 7% margin that the Company included in most of its "megadeal contracts." ¶29. Based on this low margin, Daley privately advised other EDS executives at the time the contract was awarded that the Company would likely never achieve a profit on the contract even absent problems and cost overruns, after accounting for inflation. ¶29.

From the outset of the Class Period, when EDS began recognizing revenue from the NMCI Contract, Daley's comments proved to be accurate. As detailed in the Complaint, Defendants knew at the same time that EDS was recognizing ever increasing levels of revenue from the

---

[3] Defendants' erroneously characterize this "zero-profit" methodology in their motion as "the most conservative one possible under the [percentage of completion] method." *See* Defendants' Motion To Dismiss ("Defs' Mot") at 22. No accounting standards permit a company to recognize 23% of the revenue due under a contract when only 5% of the work has been performed, as EDS did here, simply because it has incurred 23% of the costs. Indeed, such a formulation would reward any company experiencing severe cost overruns, by simply permitting it to offset these losses with additional revenue.

NMCI Contract, that the Company had been unable to meet the Navy's criteria for acceptance based on the following issues:

1.    Legacy Software:    A key component of EDS' responsibility under the NMCI Contract was the transfer of "legacy software", i.e. necessary software applications from the Navy's pre-existing computer system, to the new intranet system.    ¶31.    The transfer and elimination of duplicative legacy software was critical to the project.    Until these software applications were transferred and duplicative applications were eliminated, Navy and Marine personnel would be forced to continue to use the pre-existing workstations, rendering the new seats virtually useless and precluding Navy acceptance.    ¶¶31, 32.    Nevertheless, Defendants knew as early as the first quarter of 2001 – when EDS attempted to transition workstations at the Naval Air Systems Command in Patuxnet River, Md., that a substantial number of the legacy software applications were incompatible with the new NMCI Intranet, and could not be transitioned.    ¶31.    By 2002, EDS had identified more than 100,000 incompatible legacy software applications, which prevented the Company from meeting the requirements of the NMCI Contract.    ¶31.

2.    Inability To Pass Navy Testing Requirements:    Defendants also knew throughout the Class Period that EDS was unable to satisfy Navy testing and certification requirements under the NMCI Contract, which precluded acceptance of even 5% of the seats provided to the Navy prior to the end of the Class Period.    ¶¶13(i), 39.    As a result, in September 2001, the Navy deferred approximately $628 million in orders under the NMCI Contract – more than 9% of the total orders to be placed under the contract – until EDS satisfied the Navy's contractual testing requirements.    ¶32.    These delays not only caused EDS to terminate 10% of its workforce devoted to the NMCI Contract, but also resulted in losses that were not revealed until after the extensive problems associated with the NMCI Contract were fully disclosed.    ¶¶32, 56.

3.     Failure To Provide Remote And Secure Web Access: Other problems also plagued the NMCI Contract which precluded Navy acceptance. In an e-mail dated May 6, 2002, Naval Air NMCI Transition Manager George Kalnasy acknowledged the persistence of the legacy software issue, assuring the Navy personnel that further EDS workstations would not be delivered until the problem had been solved. ¶32. Mr. Kalnasy also detailed a series of other problems in his May 6 e-mail disrupting transition to the new intranet, including: (i) failure to provide remote access service for 61% of the users testing this function on behalf of the Navy in various facilities; (ii) failure to provide acceptable secure web access; and (iii) failure to provide adequate "help desk" support. ¶32.

D.     Defendants' Knowledge And Cover-Up Of The Fraud

Defendants were well aware of the severe problems associated with the implementation of the NMCI Contract throughout the Class Period that precluded revenue recognition, not only based upon extensive internal reports, but detailed assessments by outside governmental agencies. For example, Brown and Daley remained actively involved in monitoring the progress on contracts and costs incurred by the Company. ¶¶13(a)-(e), 14(a)-(e). Brown received daily updates as to the status of EDS' major long-term contracts, including EDS' most visible contract, the NMCI Contract, and considered these updates in determining the extent to which EDS was permitted to recognize revenue from these contracts under GAAP. ¶13(e). Both Brown and Daley referenced EDS' "service excellence dashboard" which contained material information relating to EDS' performance concerning over 90% of the Company's customers.

Brown and Daley received regular reports based on EDS' Cost Accounting System ("CAS") which was the primary tool used by EDS to determine the extent to which it completed works on its contracts. ¶¶13(f), 14(e). EDS employees entered cost and budget information concerning the Company's contracts, including the NMCI Contract, into CAS on a daily basis.

¶13(f).  The CAS' actual results indicated whether costs exceeded budgeted estimates.  ¶13(f).
Brown had this information by the seventh of each month.  ¶13(f).  Brown and Daley held
monthly telephone conference calls during which top executives compared EDS' actual and
budgeted results.  ¶¶13(f), 14(e).  In addition, EDS' accounting officer, Scot McDonald,
represented that the Company reviewed its contracts every three months.  ¶26.  If EDS found
contract expectations were off track by $5 million, then senior management joined the review.
¶26.

Defendants also knew that by the late Spring of 2002, the Institute for Defense Analysis
("IDA") completed its own independent testing of the NMCI project, and had identified numerous
problems plaguing EDS' performance and progress on the contract.  ¶33.  In reporting on the seat
roll-out process, the IDA found that the process lacked proper management oversight, lacked
product assurance which caused significant rework, and suffered from ineffective coordination of
customers for desktop delivery.  ¶35.

Rather than disclose the financial impact of the delays and product defects detailed in the
Complaint, Defendants instead embarked upon a course to accelerate the Company's revenue
recognition by simply accelerating the delivery of defective and unacceptable products to the
Navy.  On April 25, 2002, EDS NMCI Program Director Mike Hatcher sent an e-mail outlining
this "scorched earth policy" which EDS designed to deliver equipment to the Navy regardless of
functionality.  ¶¶13(i), 14(g), 37.  The e-mail, sent to EDS personnel, stated:

[W]e have agreed with [Rear Admiral] Munns and the Navy that ruthlessly rolling seats is
the only way for NMCI to survive and prosper.  Gen. Edmonds characterized this approach in a
meeting with RADM Munns as scorched earth seat rollout, and I think that pretty much tells the
story.  Our present way of working would probably only result in about 60,000 seats rolled out in
2002, which if left unchanged would spell an end to the NMCI program by summertime.  We've
come too far to let that happen . . .

The bottom line is we're going to roll seats, and will be diverting many resources to this goal. Any obstacle that gets in the way will be crushed. No more IATO delays [i.e., certifications from the Navy that the new workstations comply with security standards promulgated by the Department of Defense and are approved to operate], application packaging delays, can't get the [applications], can't get the user-to-apps mapping, can't get the definitized order, etc. We will set the seat rollout schedule, and everything else will be slave to that. If [software applications] are not there, they will get a vanilla NMCI seat with nothing but the gold disk [i.e., the standard software installed on new intranet terminals]. *If the order is not definitized, they will get a seat type of [EDS'] choosing.*

This is a good news story, and creates the breakout we've been waiting for on NMCI. Better times are just ahead!! Stout hearts . . (emphasis added.) ¶37.

E.    The Fraud Begins To Unravel

It took a hearing by the United States House Committee on Appropriations to put an end to EDS' scorched earth seat rollout, which eventually led to the Company's disclosure of its inflated revenues. On June 25, 2002, the House Committee on Appropriations found severe defects in the implementation of the NMCI Contract, and openly criticized EDS' representations that the intranet system was "ready for widespread deployment." ¶38. Based on these observations, the Appropriations Committee recommended that additional orders under the NMCI Contract wait until testing confirmed that at least 20,000 workstations, or merely 5% of the number of workstations subject to the NMCI Contract, were fully operational and met functionality standards under the contract. ¶39. By June 2002, however, EDS had already recorded revenue of approximately $1.6 billion on the NMCI Contract, representing that work was approximately 23% complete. ¶3. EDS completed the required additional testing no earlier than February 25, 2003. ¶¶13(j), 14(g). Despite this criticism by Congress, EDS continued to recognize revenue from the NMCI Contract in an amount equal to the costs incurred, despite Defendants' knowledge that these costs were generating losses. For example, on July 24, 2002, Defendants held a conference call to discuss EDS' financial results for the second quarter of 2002 and expressed their comfort with analysts' consensus estimates of $0.74 and $0.75 cents per share for the third quarter. ¶¶93,

-10-

94. Daley also made a point of assuring listeners that "EDS' accounting policies and procedures are conservative, consistent, clear and complete." ¶93. In August 2002, Defendants reiterated their earnings guidance for the third quarter and communicated a very positive outlook to the market. ¶99.

The Company's fraud began to unravel one month later, on September 18, 2002, when EDS issued a press release warning that it expected to report earnings per share of $0.12-$0.15 for the quarter as opposed to the $0.74 per share it had estimated one month earlier – approximately $0.62 – $0.64 below consensus estimates. ¶100. EDS attributed the lower earnings to a variety of factors including the "financial performance of certain contracts primarily in Europe." ¶100. Nevertheless, even though EDS did not specifically mention the huge NMCI Contract, investment analysts and the *Wall Street Journal* reporting on EDS' announcement expressed their belief that the shortfall was due in significant part to problems in EDS' application of the percentage of completion method of accounting for its long-term contracts. For example, on September 19, 2002, Bear Stearns stated:

> We feel that there is a lot more to EDS' revised guidance than the factors cited by management. To the extent that EDS mispriced contracts over the past several years and then accounted for them under POC, we may be in for a prolonged period of depressed earnings at EDS. ¶101.[4]

On the same day, Friedman Billings Ramsey downgraded EDS and questioned management's credibility and explanation for the miss in its press release:

---

[4] The Bear Stearns articles further states: We believe that the root of EDS' problems may be mispriced contracts and the way in which the company accounts for them . . . We question whether EDS' [zero] margin assumption should be considered "conservative" when in fact the company is actually losing money (as is the case on the NMCI and UK government contract). We would argue that the [zero] margin assumption actually inflates the company's profitability. We believe that EDS' application of POC accounting will become an increasingly controversial issue. *See* Affidavit of Catherine L. Aertker at Exhibit 18 (attaching for judicial notice the Bear Stearns Report dated September 19, 2003.)

-11-

> While management points out that the current economic environment is a large factor in the third quarter performance, we believe the majority of the issues facing EDS are very company-specific. Undoubtedly, the spending environment is tough, but it has been tough for a long time and for it to sneak up on EDS this way makes us question how well-controlled the operations really are.  ¶102.

*The Wall Street Journal* also interpreted EDS' September 18, 2002 announcement as clearly indicating that "at least part of the decline will come from its use of an accounting practice that relies on management discretion." ¶103.

As a result of the Company's announcement and the various analyst reports described above, the value of EDS shares plummeted from a closing price of $36.46 per share on September 18, 2002 to a closing price of $17.20 per share on September 19, 2002, a decrease of $19.26 or approximately 52%. ¶104. On October 1, 2002, EDS announced that the SEC had begun an informal inquiry into the events leading up to its negative earnings announcement. ¶106. Less than a month after that ominous disclosure, on October 30, 2002, Daley admitted to problems with the NMCI Contract relating to "seat deployment signing, average seat pricing." ¶106.

In its quarterly report for the third quarter for 2002 filed with the SEC on November 14, 2002, EDS provided further confirmation that problems plagued the NMCI Contract.  ¶107. Specifically, EDS acknowledged that it developed the pricing for the NMCI Contract based on the "assumption that the [Company] would receive revenues and seat orders in the amounts and during the periods projected in the contract's pricing schedule." ¶107. EDS admitted that due to the "significant" increase in the legacy systems the Company had to test and certify and because of the additional testing requirements imposed by the Navy and Congress, the roll-out schedule on which EDS based its pricing had been significantly delayed. ¶107.

Over the next four months, EDS revealed the full extent of the problems associated with the NMCI Contract which should have prevented recognition of any revenue under the percentage

-12-

of completion method of accounting. On January 7, 2003, and March 20, 2003, respectively, EDS announced that it had replaced Daley as CFO and that it had terminated Brown's employment "effective immediately." ¶¶108, 110.

Less than two months after terminating Brown, EDS reported that its *new* management had undertaken a review of the Company's business financials, which led EDS to take a $334 million charge on the NMCI Contract. ¶110. The charge caused EDS to report a net loss of $126 million or 26 cents per share, compared to earnings per share of 72 cents a year earlier. ¶110. According to the Company, the loss "resulted from a decline in average seat price based on the type of seats ordered and expected to be ordered by the [Navy], as well as the reduced period of time in which to generate seat revenue due to deployment delays and associated incremental estimated operating costs." ¶114.

EDS' new management also acknowledged that significant deficiencies existed in the operational effectiveness in its controls over the process of estimating revenues and costs under the NMCI Contract which rose to the level of a "reportable condition" under generally accepted auditing standards.[5] ¶¶113, 115. As a result of its review, new management disclosed that it would overhaul its controls for the NMCI Contract by taking the following steps:

> increased the frequency and scope of operational and financial reviews with senior account and corporate personnel; a newly-staffed program management office; stricter adherence to the process for approval of change orders; reorganization of account support functions and the appointment of a senior service delivery executive; assignment of additional finance and legal staff to the account; improvements in monitoring and reporting seat deployment; and improved communications with senior client representatives.

---

[5]  A reportable condition is defined as "significant deficiencies in the design or operation of internal control, which could adversely affect the organization's ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements." ¶54.

¶116.  The Company also disclosed that the SEC, which had upgraded its informal inquiry to a

Formal Investigation of EDS, had requested information relating to the NMCI Contract.  ¶117.

The SEC investigation is continuing.

III.    STANDARDS APPLICABLE TO MOTIONS TO DISMISS

In deciding a motion to dismiss for failure to state a claim, the Court must accept as true

all of the plaintiffs' well-pleaded factual allegations and draw all inferences from those facts in

favor of plaintiffs.  *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 406 (5th Cir. 2001); *see also*

*Calhoun v. Hargrove*, 312 F.3d 730, 733 (5th Cir. 2002).  "In the securities context, Rule 12(b)(6)

dismissals are difficult to obtain because the cause of action deals primarily with fact-specific

inquiries."  *Haack v. Max Internet Communs., Inc.*, No. 00-CV-1662-G, 2002 WL 511514, at *3

(N.D. Tex. Apr. 2, 2002) (citing *Basic v. Levinson*, 485 U.S. 224, 240 (1988)).    Therefore,

Defendants' motion to dismiss must be denied unless it appears beyond doubt that plaintiffs can

prove no set of facts which would entitle them to relief.  *See In re Landry's Seafood Restaurants,*

*Inc.*, No. H-00-1948, 2001 WL 34115784, at *1 n.8 (S.D. Tex. Feb. 20, 2001).

IV.    ARGUMENT

A.    New Jersey Has Stated A Claim For Violation Of § 10(b)

To state a claim under § 10(b) of the Securities Exchange Act of 1934 ("The Exchange

Act"), a plaintiff must allege:  (1) that the defendant made a misrepresentation or omission of

material fact; (2) in connection with the purchase or sale of a security; (3) with scienter; (4) that

the plaintiff relied upon; (5) causing plaintiff to suffer damages.  *Basic*, 485 U.S. at 230-32;

*Williams v. WMX Techs.*, 112 F.3d 175, 177 (5th Cir. 1997).  The PSLRA requires a plaintiff to:

(1) "specify each statement alleged to have been misleading, the reason or reasons why the

statement is misleading, and, if an allegation regarding the statement or omission is made on

information and belief . . . [to] state with particularity all facts on which the belief is formed; and

-14-

(2) "state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(1)-(2).

1.    The Complaint Alleges Facts Indicating
      Conscious Misbehavior or Severe Recklessness

The Complaint satisfies the requirements of this Circuit for alleging scienter.   In interpreting the PSLRA's requirement that the plaintiff "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind," the Fifth Circuit has determined that facts demonstrating "conscious misconduct" or "severe recklessness" constitutes scienter for § 10(b) and Rule 10b-5 claims. *Nathenson,* 267 F.3d at 407.  This Circuit has also explained that "[t]he PSLRA neither mandated nor prohibited *any* particular method of establishing a strong inference of scienter," and "circumstantial evidence can support a strong inference of scienter." *Id.* at 410.  In analyzing whether a complaint adequately alleges scienter, the court should consider whether all facts and circumstances, taken together, support a strong inference of scienter. *Id.* at 424-25.

Here, New Jersey has alleged detailed facts which support finding a strong inference of scienter. Specifically, when viewed as a whole, the importance of the NMCI Contract, Defendants' positions in the Company and their knowledge of the persistent delays and problems affecting the progress on the contract, the magnitude of the revenue overstatement, the severity of the internal control problems and violations of GAAP demonstrate that Defendants acted with fraudulent intent.

a.    Defendants' Knowledge Of The Problems
      Affecting The Progress On The NMCI Contract
      Supports A Strong Inference Of Scienter

Scienter may be alleged by specifying problems or practices that, if true, would have been obvious to insiders in a position to be familiar with the issues.  Where, as here, top executives

-15-

obviously would have known of the alleged problems, "plaintiffs are not alleging scienter based solely on the individual defendants' positions as officers." *In re NetSolve, Inc.*, 185 F. Supp. 2d 684, 697 (W.D. Tex. 2001); *Nathenson*, 267 F.3d at 425 (reversing dismissal of complaint concerning statements about patent protection for a product that was "obviously important", involved substantial company efforts, and about which the CEO had "ample opportunity to become familiar"); *see also In re Triton Energy LTD. Sec. Litig.*, No. 5:98-Civ-256, 2001 WL 872019, at *10 (E.D. Tex. Mar. 30, 2001) (finding plaintiffs' alleged strong inference of scienter based on defendants' positions, experience and other factors involving accounting violations and concealment of critical information concerning most important asset). Similarly, in *NetSolve*, the court determined that defendants would obviously know of undisclosed problems because: 1) the individual defendants were four of the top officers of the company; 2) they were directly responsible for talking to the public; and 3) the problems concerned the company's primary customer. *NetSolve*, 185 F. Supp. 2d at 697.

Courts have widely recognized that facts critical to a business's core operations or an important customer generally are so well known to the senior executives that knowledge may be attributed to them for pleading purposes. *See, e.g., Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 235 (D. Mass. 1999) (the "courts have held that certain information, particularly 'facts critical to . . . an important transaction[,] generally are so apparent that their knowledge may be attributed to the company and its key officers.'"); *In re Ancor Communs.*, 22 F. Supp. 2d 999, 1004 (D. Minn. 1998) (finding defendants would have knowledge of $30 million contract, which was undeniably the most significant contract in the company's history), referenced with approval by the Fifth Circuit in *Nathenson*, 267 F.3d at 425; *STI Classic Fund v. Bollinger Indus., Inc.*, No. 3-96-CV-823-R, 1996 WL 885802, at *2 n.2 (N.D. Tex. Oct. 25, 1996) (reasoning that based on

defendants' position in the company a strong inference arose that defendants would know of company's methods and billing practices which led to the overstated sales and revenues reported in SEC filings signed by them).

The fraud alleged here concerns facts critical to the most important contract to EDS during the Class Period, and the fourth most significant event in its corporate life.  ¶28.  Indeed, it was the largest government outsourcing contract ever awarded.  As such a significant contract, Defendants cannot deny that they were aware of the severe problems undermining completion and precluding revenue recognition including:

- After the Navy deferred orders under the contract in September 2001, EDS had to lay off approximately 10% of its work force devoted to the NMCI Contract.  ¶32.

- EDS devised a "scorched earth policy" to circumvent the delays and save the contract.  ¶37.

- During the Class Period, after the delays and defective work products reached the attention of Congress, the NMCI Contract became the subject of intense Congressional scrutiny.  ¶38.  Consequently, Congress required EDS to conduct further testing before further roll out could continue.  ¶39.

- The IDA conducted its own extensive investigation of EDS' performance under the NMCI contract and identified a number of areas which it deemed were causes for concern.  ¶¶33-35.

Accordingly, knowledge of the facts concerning the NMCI Contract may be imputed to the Defendants and support a finding of scienter.

Brown and Daley further acknowledged in sworn certifications filed with the SEC that they were responsible for both creating and maintaining the Company's internal control

procedures.  ¶¶13(c), 14(c), and signed the alleged false and misleading SEC filings filed during the Class Period.  ¶¶13(b), 14(b).  Moreover, Brown and Daley, two of EDS' top officers, remained actively involved in the day-to-day operations of the Company.  Both stayed abreast of EDS' cost and budget information concerning the Company's contracts by receiving daily updates from CAS.  ¶¶13(f), 14(e).  Additionally, Brown habitually checked the Company's "service excellence dashboard," an internet-based interface containing material information regarding the progress of EDS' contracts. ¶13(e).  Throughout the Class Period, Defendants repeatedly assured investors that they were fully apprised of the Company's accounting policies.  *See, e.g.,* ¶90 (describing conference called hosted by Brown and Daley during which they claimed EDS had strong internal controls and a sophisticated system for estimating costs); ¶91 (Brown reiterating Daley's claim that EDS has strong internal controls in place); ¶93 (describing second conference call during which Daley described "with confidence" that EDS' accounting policies and procedures as conservative, consistent, clear and complete).   Based on their knowledge of these facts, Defendants knew or were reckless in disregarding that the NMCI Contract was no more than 5% complete by the end of the Class Period, rather than 23% represented through the Company's recognition of over $1.6 billion in revenue.

     b.  Defendants' Violation Of GAAP Further Supports A
        Strong Inference Of Scienter

   While a GAAP violation, standing alone, does not automatically raise a strong inference of scienter, "this does not mean that a misapplication of accounting principles . . . can never take on significant inferential weight in the scienter calculus." *Triton*, 2001 WL 872019 at *11; *see also Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246 (N.D. Ill. 1997) (finding scienter where plaintiffs alleged GAAP violations and that defendants had control and access to financial information and statements made to public).  "GAAP [is] intended to provide a reliable degree of predictability,

and an application of GAAP that strays beyond the boundaries of reasonableness will provide

evidence from which scienter can be inferred." *In re Raytheon Sec. Litig.*, 157 F. Supp. 2d 131,

148 (D. Mass. 2001).

In accounting for the NMCI Contract, Defendants improperly used the percentage of

completion method of accounting. A critical factor in determining whether this method of

accounting is appropriate depends on a company's "ability to make reasonably dependable

estimates . . . of the extent of progress toward completion, contract revenues, and contract costs."

¶48.  As new management would admit after the Class Period, EDS had significant deficiencies

in its internal controls used to estimate revenues and costs in connection with the NMCI Contract.

Thus, EDS lacked the necessary controls during the Class Period to make meaningful

measurement "of the extent of progress to completion" of the contract (¶48) and should not have

recognized revenues using the percentage of completion method of accounting. [6]

---

[6]  Defendants' assertion that because EDS generates substantial revenue it is entitled to the
presumption that the percentage of completion method is appropriate ignores EDS' past history.
GAAP provides that "[p]revious reliability of a contractor's estimating process is usually an
indication of continuing reliability, particularly if present circumstances are similar to those that
prevailed in the past." ¶50. As detailed in the Complaint, Defendants had problems in the past in
recognizing revenue. *See* ¶51 (EDS took non-recurring charges and charge relating to percentage
of completion of accounting on Xerox contract); ¶¶52, 53 (EDS' own internal auditors criticized
the manner in which EDS used the percentage of completion method of accounting); ¶52 (KPMG
wrote EDS management letters in 1996-1998 expressing uneasiness with the Company's
accounting practices in EDS' non-US operating units.); ¶53( Top EDS officials were made aware
of that EDS was improperly recognizing revenue under one of the Company's largest contracts in
Brazil.).  Contrary to Defendants' claim with respect to the KPMG management letters, New
Jersey has alleged who wrote the letter (KPMG), to whom it was sent (EDS), and what caused the
lack of comfort (EDS' accounting practices in its non-US operating units). ¶52.  As to the
significance of the issues, KPMG, the Company's external auditor, expressed uneasiness with
EDS' *accounting* practices at the same units for three years running in its "management letters."
The repeated scrutiny and the manner in which the problem was conveyed indicates it rose above
some minor difference of opinion between EDS and KPMG. Moreover, after the third letter, EDS
began its own internal investigation. ¶52. Further, this Circuit does not require the naming of
sources.  *See ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 353 (5th Cir. 2002)

Moreover, even EDS' use of the "zero profit" percentage of completion method violated GAAP. To use this method, a company must have assurance that it will not incur a loss on the contract. AICPA Statement of Position ("SOP 81-1") at ¶33, ¶48.    Here, EDS lacked any assurance that it would not incur a loss on the contract. To win the contract, EDS had allowed itself a very slim profit margin of 4%. ¶29.

In fact, Daley had told other EDS' executives at the outset of the contract that the Company would likely never achieve a profit on the contract. ¶29. Given the small profit margin built into the contract (¶29), any unforeseen problems creating delays, like the discovery of thousands of incompatible legacy systems, would create cost overruns and generate a loss. ¶¶30, 31. Without the assurance that it would not recognize a loss, EDS was not entitled to recognize revenue on the contract pursuant to the zero profit method.

Additionally, while the zero profit method permits companies to recognize revenues equal to their costs, the revenues must relate to progress made on the contract. Thus, as with the percentage of completion method generally, in order to employ the zero profit method, a company must possess the ability to make reasonably dependable estimates. A contractor must periodically review the circumstances of the contract by alternative measures that involve "observation and inspection" to ensure that the method of accounting fairly and accurately reflects progress on the contract. SOP 81-1 at ¶51.

---

(aligning Fifth Circuit with Second Circuit by not requiring plaintiffs to name confidential sources). Plaintiffs have identified these sources by their position and have described how they would be in a position to know the information they have provided. Defendants' contention that these witnesses lack specific information as to the NMCI Contract misses the point. These sources support New Jersey's allegations that Defendants were on notice that EDS had a history of problems with proper revenue recognition and thus they should have questioned EDS' use of percentage of completion accounting on the NMCI Contract.

In employing the zero profit method, Defendants wholly ignored GAAP and simply recognized its costs as revenues without regard to the progress EDS was making under the contract. In recognizing too much revenue, Defendants disregarded that due to the delays, defective work product and additional testing, EDS had failed to complete even 5% of workstations required under the contract. EDS' failure to complete even 5% of the contract by June 2002 is borne out by the allegations that Congress refused to allow the Navy to order additional seats until EDS demonstrated 20,000 seats, or 5% of the 360,000 seats required under the contract, satisfied the criteria for acceptance in the NMCI Contract. ¶39. EDS met this requirement no earlier than February 25, 2003, five months after the Class Period ended. ¶13(j). GAAP does not permit Defendants to turn a blind eye to the realities of the progress made on a contract and simply recognize substantial revenues based on skyrocketing costs.

In light of EDS' past history, lack of assurance it would not incur a loss, and the significant deficiencies in its ability to estimate revenue and costs over the NMCI Contract, GAAP required EDS to use the "completed contract" method. In using the completed contract method, EDS would have had to defer recognizing revenue on the NMCI Contract until EDS had completed or substantially completed the work on the contract. ¶¶47, 48.

Finally, EDS violated GAAP by failing to recognize losses on the NMCI Contract in the period in which they became evident. Under both the percentage of completion method and completed contract method, provisions for losses must be made in the period in which they become known. ¶56. Here, EDS failed to recognize a loss on the NMCI Contract during the Class Period, despite the small profit margin, the increasing delays and cost overruns. Rather, new management took the $334 million loss on the NMCI Contract after the Class Period for reasons known to defendants during the Class Period – the shortened time in which to deploy the

seats and associated incremental estimated operating costs.    Given Defendants' repeated

representations during the Class Period that they continually reviewed EDS' contracts, Defendants

knew of this loss or recklessly disregarded it prior to EDS' new management's announcement in

the first quarter of 2003.

    The fact that EDS has not restated its prior financial results in no way undermines the

strength of these allegations.    Nor can EDS hide behind KPMG's audit opinion to escape liability

for Defendants' own fraud.    The responsibility for preparing financial statements that conform to

GAAP and maintaining sound accounting policies and internal controls rests with corporate

management, not with the auditors.    ¶41.    In rejecting a similar argument, the United States Court

of Appeals for the First Circuit reasoned:

> [T]he fact that the financial statements for the year in question were not restated
> does not end [plaintiff's] case when he has otherwise met the pleading
> requirements of the PSLRA. To hold otherwise would shift to accountants the
> responsibility that belongs to the courts. It would also allow officers and directors
> of corporations to exercise an unwarranted degree of control over whether they are
> sued, because they must agree to a restatement of the financial statements.

*See Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002).

    Indeed, investors commonly state, and courts uphold, claims for violations of the federal

securities laws even absent a company's restatement which admits errors in a company's past

financial results.    *See, e.g, Triton*, 2001 WL 872019 at *4-5 (upholding complaint alleging

defendants failed to take timely write-downs); *In re Secure Computing Corp.*, 184 F. Supp. 2d

980, 989 (N.D. Cal. 2001) (denying motion to dismiss absent allegations of a restatement because

plaintiffs pled facts sufficiently detailed and specific to show defendants recklessly recognized

revenue on contract with National Security Agency); *In re Accelr8 Tech. Corp. Sec. Litig.*, 147 F.

Supp. 2d 1049, 1055 (D. Colo. 2001) (upholding complaint alleging improper revenue recognition

where plaintiff did not allege a revenue restatement).

-22-

Similarly, here, Defendants cannot shield themselves from liability by holding up KPMG's "approval" or audit opinions or by pointing to the lack of a restatement of prior financial results. Consistent with their responsibilities, Brown and Daley repeatedly assured the market that the Company's financial results during the Class Period presented fairly the financial position of EDS. *See, e.g.,* ¶¶42, 43, 44, 90, 91, 92, 93. Moreover, Brown and Daley both signed EDS' financial statements which reported the inflated earnings and improper revenues on the NMCI Contract during the Class Period. *See Howard v. Everex Sys.*, 228 F.3d 1057 1061, 1064 (9th Cir. 2000) (finding scienter where executive signed financial statements despite red flags concerning company's financial condition).   During the Class Period, Brown and Daley filed sworn certifications  with the SEC, wherein they attested to the accuracy of EDS' reported financial results for Fiscal 2001 and the first two quarter of 2002.  ¶¶13(b), 14(b).  In the third quarter of 2002, Brown and Daley also filed signed certifications with the SEC in which they both stated they were responsible for establishing and maintaining disclosure controls and procedures, had evaluated the effectiveness of EDS' disclosure controls and procedures and that they were effective.  Further, both certified that there were no "significant deficiencies in the design or operation of internal controls which could adversely affect [the Company's] ability to record, process, summarize and report financial data . . . ."  ¶¶13(c), 14(c).  Brown made the same certification again on March 12, 2003.  ¶13(c)  Only *two months* before new management disclosed the existence of significant deficiencies relating to the NMCI Contract. ¶13(c).

After the terminations of Brown and Daley, EDS' *new* management undertook a review of the NMCI contract and, within two months after Brown's termination, brought the problems to the attention of KPMG - not the other way around.  ¶¶110, 113, 115.  Approximately five months after Brown's and Daley's terminations from their respective positions, EDS' new management

publicly disclosed the existence of these enormous problems. *See In re First Merchants Acceptance Corp. Sec. Litig.*, No. 97 C 2715, 1998 WL 781118, at *11 (N.D. Ill. Nov. 4, 1998) (magnitude of overstatement combined with allegation that company's new chief financial officer discovered discrepancies in financial statements within weeks of his arrival supports strong inference of recklessness against auditor).

        c.      The Sheer Magnitude Of The Charge And
                  Seriousness Of The Internal Control Deficiencies
                  Support A Strong Inference Of Scienter

        The magnitude of the $334 million charge and the severity of the problems finally revealed by the Company as existing in its internal controls for estimating revenues and costs in connection with the NMCI contract further support a strong inference of scienter. *See Florida State Board of Admin. v. Green Tree Financial Corp.*, 270 F.3d 645, 649-50, 665-66 (8th Cir. 2001) ("sheer size" of the $390 million adjustments including $200 million reduction to 1996 earnings and $190 increase to reserve in 1998 adds to inference that defendants knew they used unrealistic assumptions in accounting for loans); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 327 (S.D.N.Y. 2001) (finding magnitude of the charge for writing off bad-debt where collections have three year collection cycle support finding inference of scienter); *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (magnitude of $73.8 million write-off of $87.5 million in royalty advancements taken approximately two months after class period ended combined with allegations of slowing sales and lawsuits supported strong inference of scienter); *see also Rehm v. Eagle Fin. Corp.*, 954 F. Supp. 1246, 1256 (N.D. Ill. 1997) ("The more serious the error, the less believable are defendants protests that they were completely unaware of [the company's] true financial status and the stronger is the inference that defendants must have known about the discrepancy.").

Here, Defendants wrote-off $334 million in revenue, or over 20% of the revenue recorded under the terms of the NMCI contract, after only two years into the five year contract. According to Scott McDonald, EDS' treasurer, the Company undertook a review every three months to ensure that contract expectations were on track. ¶26. If a contract was off by $5 million, then senior management joined the review. ¶26. Despite this expressed continual review, however, EDS needed to write off $334 million in one quarter due in part to the reduced period of time in which to generate seat revenue. ¶114. The loss contributed to EDS reporting a net loss of $126 million or $0.26 cents per share in the first quarter of 2003, compared with earnings per share of $0.72 the previous year. ¶110. The shortened time in which to generate seat revenue and incremental estimated operating costs did not occur all at once. Rather, these problems emerged during the two years when EDS was in the process of implementing the contract.

Moreover, the problems finally disclosed by EDS were by no means minor. Rather, they rose to a level of a "reportable condition", which GAAS defines as: "[S]ignificant deficiencies in the design or operation of internal control, which could adversely affect the organization's ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements." ¶54. To fix the problems, EDS needed to overhaul its controls relating to its accounting for revenues and costs from the NMCI Contract. ¶116. The enormity of the charge and the extensive remedial measures needed by EDS to fix its internal controls support finding that Defendants knew or recklessly disregarded that these problems existed during the Class Period. [7]

---

[7]    The case upon which Defendants rely is distinguishable. *See* Defs' Mot. at 21 (citing *McNamara v. Bre-X Minerals Ltd.*, 57 F. Supp. 2d 396, 415 (E.D. Tex. 1999). In *Bre-X*, plaintiffs made the "inferential leap" that because a defendant knew of negative test results, it knew or recklessly disregarded the fact that no gold existed at a particular site. *Bre-X*, 57 F. Supp. 2d at

       d.     New Jersey's Reliance On Admissions Following
                   Disclosure Of The Fraud Is Appropriate To
                   Support A Strong Inference Of Scienter

Defendants' contention that New Jersey's reliance upon EDS' post class period disclosure of the $334 million charge and the later disclosure of the existence of significant deficiencies in EDS' internal controls constitutes fraud by hindsight is erroneous. None of the false and misleading statements alleged in the Complaint constitute "optimistic forecasts" that simply failed to materialize. Rather, the false and misleading statements alleged in the Complaint concern EDS' *current or past* financial results or business operations. *See, e.g.*, ¶57 (discussing results for the fourth quarter of 2000) ¶61(discussing results for the first quarter of 2001); ¶67 (discussing results for the second quarter of 2001); ¶¶90-93 (representing that EDS has strong financial controls and clear and complete accounting polices). Further, New Jersey uses these disclosures to show that Defendants possessed this information contemporaneous with or before improperly recognizing revenue and issuing fraudulent statements. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("Any information that sheds light on whether class period statements were false or materially misleading is relevant."); *In re Grand Casinos Sec. Litig.*, 988 F. Supp. 1273, 1283 (D. Minn. 1997) (rejecting contention that complaint pled fraud by hindsight because revelations after class period conveyed more than poor results, which due to some intervening event, may not have been foreseen by management in advance); *see also Raytheon*, 157 F. Supp. 2d at 142, 151 (reliance on post-class period statements appropriate where nature of problem such

---

415, 417. Plaintiffs had not alleged whether or not the tests were conclusive, overwhelmed by positive tests or limited to a small or large area. *Id.* at 415. Here, New Jersey has alleged problems so severe that they led to the customer deferring payment and requiring additional testing, Congress scrutinizing EDS and questioning its veracity, and an independent testing agency finding severe problems. Additionally, the Company itself sought to institute desperate measures to save the contract. ¶37.

as cost overruns and losses on a fixed contract with the government likely apparent to management before public disclosure).

The revelations after the Class Period that Plaintiff relies upon do not "merely convey poor results" which may not have been foreseen by management in advance. Instead, the Complaint alleges that EDS' failure to account for the delays, problems and cost overruns plaguing the progress on the NMCI contract during the Class Period not only precluded recognition of $1.6 billion in revenue, but also resulted in a $334 million loss on the contract after the Class Period ended. Further, EDS admitted to the "significant deficiencies" existing in the Company's internal controls only five months after new management took control, which rose to a level of a "reportable condition." The numerous and extensive steps that the Company indicated that it needed to take to remedy the deficiencies indicate that these deficiencies did not occur all at once. Rather, the remedial measures instituted by new management further support New Jersey's allegations that Defendants knew or were severely reckless in disregarding that they lacked the proper internal controls during the Class Period, and should not have used the percentage of completion method to report revenue on the NMCI Contract.

Defendants' reliance on cases where plaintiffs allege fraud based on the timing of a company's write off of accounts receivable or failure to increase loan loss reserves is misplaced.[8]

---

[8] *See Goldstein v. MCI WorldCom,* 340 F.3d 238, 253 (5th Cir. 2003) ("In sum, the complaint[] . . . depicts [] mismanaged accounts receivable situation handled by many far-flung departments that frequently, without direction from upper management, [ignored delinquent accounts.]"); *Abrams v. Baker Hughes, Inc.,* 292 F.3d 424, 433 (5th Cir. 2002) (company took small charge related to write offs for accounts receivable, inventory write downs and unrecorded employee compensation which could "easily arise from negligence, oversight or simple mismanagement"); *In re Azurix Corp. Sec. Litig.,* 198 F. Supp. 2d 862, 869 (S.D. Tex. 2002) (scienter allegations based on the defendant's overzealous claims of its "ability to take advantage of the growing trend of privatization" in Argentina); *Coates v. Heartland Wireless Comm., Inc.* 100 F. Supp. 2d 417, 427 (N.D. Tex. 2000) (after amendments, complaint still failed to allege how defendants acted

Here, the Navy's credit worthiness was never at issue. ¶98. Similarly, Defendants' cases in which plaintiffs alleged mere mismanagement are also inapposite.[9] New Jersey alleges that Defendants improperly recognized revenue when it was improper to do so, given the state of completion on the NMCI Contract, not that they exercised poor business judgment in "risky" investments or inappropriately characterized an aged receivable. Defendants' reliance on *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) in support of their argument that New Jersey pleads "fraud by hindsight" is particularly confusing given that the *Novak* court used post class period disclosures as evidence supporting plaintiffs' allegations. *Novak*, 216 F.3d at 312-13. Moreover, none of the cases cited by Defendants deny the use of post class period disclosures as an appropriate method to infer a defendant's scienter.

### 2.    New Jersey Has Properly Pled Loss Causation

New Jersey has alleged that Defendants' misrepresentations throughout the Class Period were directly responsible for New Jersey's economic loss. In alleging loss causation, a plaintiff

---

unreasonably in not writing down debts due 60 days or more."); *DiLeo v. Ernst & Young*, 901 F.2d 624 (7th Cir. 1990) (finding fraud pled by hindsight where dispute about timing of write-off was based on estimates of the probability that a particular debtor will pay); *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (no inference of scienter where plaintiffs alleged defendants failed to disclose investments in "risky" securities); *Posner v. Coopers & Lybrand*, 92 F.R.D. 765, 768, 769 (S.D.N.Y. 1981) (after amendment, plaintiffs still failed to allege any facts that defendants knew that garbage conversion process would not work, thus making its accounting practices improper). Defendants' reliance on *Urbach v. Sayles*, 779 F. Supp. 351 (D.N.J. 1991) is misplaced. In *Urbach*, the court reviewed its order denying defendants' motion to dismiss and once again found plaintiffs adequately pled scienter to find that defendants' statements concerning the adequacy of the company's reserves were false when made – particularly, where, three months prior to revealing the need to increase reserves, defendants claimed their reserves were adequate. *Urbach*, 779 F. Supp. at 361-62.

[9]    *See In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 889-90 (S.D. Tex. 2001) (complaint failed to allege how defendants would have learned of problems with sales force and may be due to mismanagement); *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1326 (M.D. Fla. 2002) (write-off for delinquent accounts receivable from 1998 through 2000 did not raise strong inference with respect to CFO and CEO who held positions for only a "short time" before announcement and handling of receivables mainly done by third-party mortgage service).

must show "that the untruth was in some reasonably direct, or proximate, way responsible for his loss." *See Huddleston v. Herman & Maclean*, 640 F.2d 534, 549 (5th Cir. 1981). This causation element can be met where "the misrepresentation touches upon the reasons for the investment's decline in value." *Id.*

While the Fifth Circuit has not directly addressed the issue of pleading loss causation since *Huddleston*, district courts in this Circuit have expressed an approach similar to the one espoused by the Ninth Circuit in *Broudo v. Dura Pharm., Inc.*, 339 F.3d 933, 938-39 (9th Cir. 2003), where the court found that to plead loss causation, "it is not necessary that a disclosure and subsequent drop in the market price of the stock have actually occurred, because the injury occurs at the time of the transaction." For example, in *Zuckerman v. Foxmeyer Health Corp.*, 4 F. Supp. 2d 618 (N.D. Tex. 1998), the court based the harm caused to the plaintiff on the artificial inflation of the price at the time of purchase, and did not require a one-to-one correspondence between the drop in value and the corrective disclosure. *Id.* at 626.[10] Accordingly, here, New Jersey has alleged that Defendants' misstatements inflated EDS' share price concomitantly harming the value of New Jersey's investment at the time of purchase. This alone is sufficient to allege loss causation under the more relaxed standard espoused in *Dura* and *Zuckerman*.[11]

Even under the loss causation standard articulated by other circuits, however, New Jersey has alleged a sufficient link between Defendants' misstatements regarding the NMCI Contract and

---

[10] *See also Krogman v. Skerrit*, No. 3:98-CV-2895, 1999 WL 1455757, *3 (N.D. Tex. July 21, 1999) (finding loss causation adequately pled where plaintiffs (1) "describe[d] an elaborate scheme to artificially inflate" the stock price, (2) "were induced into purchasing [the stock] at the artificially inflated prices" and (3) "claim that they would not have purchased the stock had they known the truth. . . ."

[11] *See also Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 832 (8th Cir. 2003) ("[P]laintiffs were harmed when they paid more for the stock than it was worth. This is a sufficient allegation").

the decline in EDS' stock price following the markets' reaction to EDS' September 18, 2002 disclosure. ¶¶100-105. Under the standard asserted by Defendants, a plaintiff must plead a causal connection between the misrepresentation and the investment's subsequent decline in value." *See Robbins v. Koger Props. Inc.*, 116 F.3d 1441, 1447 (11th Cir. 1997). This, New Jersey has done. Indeed, the requirement of pleading loss causation "is not a difficult one, and it ought not to place unrealistic burdens on the plaintiff at the initial pleading stages." *See Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997).[12]

To satisfy this nexus, New Jersey has alleged statements from analysts made on the first trading day after the September 18 release, which specifically tie the disclosure and subsequent decline in value of EDS' share price to investors' fears about EDS' possible improper use of percentage of completion accounting. ¶¶101-102. Additionally, days after EDS' shocking third quarter 2002 announcement, *The Wall Street Journal* observed "it is clear that at least part of the decline will come from its use of an accounting practice that relies on management discretion." ¶103. Consequently, the Company's disclosure raised suspicions in the market that EDS improperly recognized revenue on other long term contracts. ¶104.

Defendants would have this court find loss causation only in circumstances where the words in a defendant's disclosure mirror the allegations in a plaintiff's complaint. Yet,

---

[12] For purposes of a motion to dismiss, moreover, the court does not inquire as to whether plaintiff's allegations can be proved, but merely assesses whether a plaintiff has sufficiently *alleged* loss causation in the complaint. *See, e.g., Robertson v. Strassner*, 32 F. Supp. 2d 443, 449 (S.D. Tex. 1998) ("[w]hether [the] Plaintiffs can prove their allegations of loss causation . . . is not an appropriate inquiry on a motion to dismiss."). In fact, plaintiffs are required simply to allege causation "sufficiently to put Defendants on notice of the charges against them." *Zuckerman* 4 F. Supp. 2d at 626. Defendants' argument that Plaintiff relies upon analyst speculation to assert its fraud claim is misdirected. *See* Defs' Mot. at 35 (*citing Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999)). *Philips* merely states that it is improper to base an inference of scienter on "speculation." *Id.* at 623. Here, Plaintiff uses the analyst statements not to speculate on Defendants' motive, but rather to show how the market reacted to the news released by EDS.

Defendants offer no precedent for this reasoning.[13] Under this scenario, defendants could be forever shielded from claims of fraud by withholding the true reasons for a plaintiff's loss, while at the same time the market reacts to negative information linked to defendants' prior misrepresentations or omissions.

Defendants' argument that EDS' stock price dropped because of the Company's diminished earnings expectation going forward, rather than because of the misrepresentations of its accounting for the NMCI Contract, is unavailing at this stage of the litigation. Whether the alleged misstatements actually were the cause-in-fact of the drop in price of EDS stock raises an issue of fact which is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss. *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003); *see also In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1229 (D. Kan. 2002).[14]

---

[13] Defendants go to great length to analogize the facts of this case to those in *Anderson v. First Sec. Corp.*, 249 F. Supp. 2d 1256 (D. Utah 2002), yet fail to point out the major distinguishing factor: in *Anderson*, the court did not find defendant's statements to be misleading. *Id.* at 1267. Therefore, there were no misrepresentations to link to the harm caused to plaintiffs. In contrast, New Jersey has alleged in detail in the Complaint, the false and misleading statements made by Defendants which artificially inflated the price of the stock. Further, the decisions relied upon by Defendants have no bearing on the facts in this case. *See In re Merrill Lynch Co., Inc.*, No. 02 MDL 1484 MP, 2003 WL 21500293, *7 (S.D.N.Y. June 30, 2003) (finding that there was no causal connection between the burst of the Internet bubble and the alleged omission); *Greenwald v. Orb Communs. & Mktg., Inc.*, 192 F. Supp. 2d 212, 227 (S.D.N.Y. 2002) (the court found that "there is no allegation that [the plaintiff] has suffered a loss on the security, much less that the alleged misrepresentations and omissions were the proximate cause of such a loss."); *Arduini/Messina Partnership v. Nat. Med. Fin. Services Corp.*, 74 F. Supp. 2d 352, 362 (S.D.N.Y. 1999) (finding no loss causation where plaintiffs alleged that "insiders mismanaged the company [] or otherwise breached their fiduciary duties . . ." the court noted that "[s]uch allegations might be sufficient to support a derivative claim but they cannot provide the basis for a securities fraud claim.").

[14] *See also Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1117 (5th Cir. 1988), *vacated and remanded on other grounds by, Fryar v. Abell*, 492 U.S. 914 (1989). In *Abell*, Defendant argued that the reason for the investment's decline in value was the bankruptcy of a bank which "dramatically affected [defendant's] cash position at a critical point in the project's development." Plaintiffs had argued, and the jury agreed, that the failure of a land transaction caused the

3.    Reports Of Problems And Delays With The NMCI
      Contract Did Not Reveal Defendants Overstated
      Revenues And Earnings Or Had Significantly
      Deficient Internal Controls

Defendants argue that because New Jersey alleges EDS traded in an efficient market and

information about EDS' problems with the progress on the NMCI Contract surfaced in various

reports that the market price of EDS' stock reflected that information. Thus, Defendants contend

that New Jersey was not harmed. Defs' Mot. at 19. Defendants' oblique reference to the "truth

on the market defense" misses the mark. The truth on the market defense stands for the

proposition that a misrepresentation is immaterial if the information is already known to the

market because the misrepresentation cannot then defraud the market. *Ganino v. Citizens Utils.

Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (rejecting defendants' attempt to rely on "truth on the

market" defense to dismiss plaintiffs' 10(b) claim while noting defense is intensely fact specific);

*In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1373 (S.D. Fla. 2001). While reports of

EDS' problems with its work on the NMCI Contract may have reached the market, the public

remained unaware that EDS was improperly recognizing revenue on the contract.

In *Unicapital*, plaintiffs asserted that the individual defendants knew that a federal statute

prohibiting certain noisy aircrafts would render the corporation's fleet of aircraft useless at the end

of 1999. *Unicapital*, 149 F. Supp. 2d at 1372. Plaintiffs alleged that despite defendants'

knowledge of the looming deadline for phasing out noisy aircraft and the financial repercussions

that it would have on the company, defendants omitted negative financial information in its

─────────────────────

investment's decline in value. The Fifth Circuit found that the "jury was entitled to believe that
this real estate deal 'touched upon' the reasons for" the investment's decline in value. *Id.* The
court further noted, "[o]ur task is not to justify the jury verdict, but to ascertain whether the
evidence sufficiently supported a least one view of the facts to permit a verdict for the plaintiffs."
*Id.* at 1117 n.13

filings. *Id.* In May 2000, defendants disclosed that the company would record a charge totaling over $200 million due to the decline in market value for the company's aircrafts. *Id.* at 1361. The court rejected defendants' truth on the market defense that because the market was deemed to know of the existence of the federal statute, the company's failure to account for its effect was immaterial. *Id.* at 1373. The *Unicapital* court reasoned that what was germane, and what defendants failed to disclose, was the adverse impact the statute would have on the company's operations. *Id.*

Defendants' invocation of the truth on the market defense here must likewise fail. While information concerning problems and delays with the NMCI Contract may have entered the market and factored into the market price of EDS stock, as in *Unicapital,* Defendants failed to disclose that EDS had artificially inflated its revenues as a result of these problems. In fact, EDS took great pains to assure investors and analysts that its accounting was clear and the Company had strong internal controls and thus its recognition of revenue was proper. *See, e.g.,* ¶¶90-91 (describing July 2 conference call during which Brown and Daley assured analysts their accounting was sound); ¶92 (July 24 press release stating EDS' business and financial fundamentals are sound); ¶93 (describing the July 24 conference call during which Brown and Daley represented they had strong internal controls); ¶99 (discussing EDS' positive outlook and confidence in meeting expectations). Thus, New Jersey and the market remained unaware until September 18, 2002, that EDS was improperly using the percentage of completion method, and ultimately, that it should have recognized losses, and not revenue, on one of its most significant contracts.

B.    New Jersey Has Stated A Claim For Violation Of § 20(a)

Section 20(a) of the Exchange Act establishes derivative liability for persons who "control" those who are primarily liable under the Exchange Act. 15 U.S.C. § 78t(a).[15] In the Fifth Circuit, a plaintiff need only show that the alleged control person possessed the power to control the primary violator. *See In re Enron Corp. Sec. Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 595 (S.D. Tex. 2002). *Accord Everex*, 228 F.3d at 1065-66 (finding plaintiffs sufficiently alleged executive was controlling person under § 20(a) because of his day-to-day management of the company and his review and signature on the financial statements).

Here, New Jersey has alleged in great detail Brown and Daley's day to day control over the Company and their power to directly and indirectly control or influence corporate policies. *See* ¶¶13(a)-(k); 14(a)-(g). Moreover, during the Class Period, Brown and Daly certified to the accuracy of the Company's financials results and its internal controls. *See infra* p. 23. In light of these detailed allegations, Defendants' sole argument for the dismissal of New Jersey's control person allegations under § 20(a) is that its § 10(b) claims are inadequate. As detailed herein, New Jersey has adequately pled Defendants' liability under § 10(b), therefore Defendants' request to dismiss the § 20(a) claims should be denied. *See Haack*, 2002 WL 511514, *8 ("[b]ecause the court has previously denied the individual defendants' motion to dismiss [the Company's] § 10(b) claims, the court denies dismissal under § 20(a) as moot.").

---

[15] Section 20(a) provides: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

C.     Should The Court Be Inclined To Dismiss The Complaint, New
       Jersey Requests Leave To Amend

       Should this Court be inclined to dismiss the Complaint, New Jersey respectfully requests

an opportunity to amend the Complaint under Rule 15(a) of the Federal Rules of Civil Procedure.

Rule 15(a) directs that leave to amend "shall be freely given when justice so requires." Fed. R.

Civ. P. 15(a); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Lone Star Ladies Inv.*

*Club v. Schlotzsky's, Inc.*, 238 F.3d 363, 367 (5th Cir. 2001) (reversing district court to allow

plaintiffs to amend).   The rule "severely restricts" a court's freedom to deny leave because it

evinces a bias in favor of granting leave to amend. *See Dussouy v. Gulf Coast Inv. Corp.*, 660

F.2d 594, 597-98 (5th Cir. 1981) ( "[U]nless there is substantial reason to deny leave to amend,

the discretion of the district court is not broad enough to permit denial."); *see also Eminence*

*Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1053 (9th Cir. 2003) (reversing lower court's

denial for leave to amend where plaintiffs' claims were not frivolous, they were endeavoring to

meet pleading standards with court's guidance and had reasonable chance of stating a claim).

When dismissing complaints for violations of the federal securities laws, courts in this Circuit

have provided plaintiffs with the opportunity to amend. *See Bre-X*, 57 F. Supp. 2d 396 (granting

plaintiffs' thirty days to replead); *Coates v. Heartland Wireless Commans., Inc.*, 26 F. Supp. 2d,

910, at 923 (N.D. Tex. 1998) (granting leave to amend to allow plaintiffs to state a claim and

finding nothing in the language of the PSLRA requires courts to dismiss securities fraud claims

without first granting leave to amend).[16]

---

[16]  Indeed, the liberal amendment provisions of Rule 15(a) remain intact even in light of recent
decisions by the Fifth Circuit upholding denials of plaintiffs' request to amend.  In those cases, the
Fifth Circuit found undue delay warranting the lower court's denial of plaintiffs' request. *See*
*Schiller v. Physicians Res. Group Inc.*, 342 F.3d 563, 567 (5th Cir. 2003) (upholding denial of
leave to amend where given the veracity of the challenges to the *third* amended complaint
plaintiffs could and should have sought leave to amend for the *fourth* time before dismissal and

This is not a case where plaintiffs have had multiple opportunities to replead or unduly delayed in seeking to amend. Here, New Jersey has only filed one "amended" complaint, which is actually the *first* consolidated complaint. *See Eminence*, 316 F.3d at 1051 (noting district court had granted leave to amend the first consolidated complaint). Accordingly, the strong bias under Rule 15(a) for permitting amendment weighs in favor of this Court granting New Jersey leave to replead before dismissing the Complaint with prejudice.

---

had had more than a year to do so); *MCI WorldCom*, 340 F.3d at 243, 254-55 (upholding denial where plaintiffs had approximately seven months from the filing of defendants' motion to dismiss before court dismissed the "poorly drafted" and "repetitive" complaint, but failed to do so).

V.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied in its entirety.

Dated: October 6, 2003                     Respectfully submitted,

                                           NICKENS, KEETON, LAWLESS,
                                              FARRELL & FLACK, LLP


                                           _____
                                           JACKS C. NICKENS (Bar No. 15013800)
                                           600 Travis, Suite 7500
                                           Houston, Texas 77002
                                           Tel:    (713) 571-9191
                                           Fax:    (713) 571-9652

                                           Liaison Counsel

                                           BERNSTEIN LITOWITZ BERGER
                                              & GROSSMANN LLP
                                           ALAN SCHULMAN
                                           ROBERT S. GANS
                                           12544 High Bluff Drive, Suite 150
                                           San Diego, CA 92130
                                           Tel:    (858) 793-0070
                                           Fax:    (858) 793-0323
                                                     -and-
                                           EDWARD A. GROSSMANN
                                           1285 Avenue of the Americas
                                           New York, NY 10019
                                           Tel:    (212) 554-1400
                                           Fax:    (212) 554-1444

                                           GREENBAUM, ROWE, SMITH, RAVIN,
                                              DAVIS & HIMMEL LLP
                                           MICHAEL B. HIMMEL
                                           ROBERT J. KIPNEES
                                           Metro Corporate Campus 1
                                           P.O. Box 5600
                                           Woodbridge, NJ 07095
                                           Tel:    (732) 549-5600
                                           Fax:    (732) 549-1881

                                           Co-Lead Counsel

::ODMA\PCDOCS\blbgea\11512\3

## CERTIFICATE OF SERVICE

I, do hereby certify that on this 6th day of October 2003, true and correct copies of the

foregoing ***NEW JERSEY'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS;***

***[PROPOSED] ORDER DENYING DEFENDANTS' MOTION TO DISMISS*** has been duly

and properly served upon the counsel of record listed on the attached Service List in accordance

with the Federal Rules of Civil Procedure.

 

 

JESSICA WILSON

 

::ODMA\PCDOCS\BLBGCA\11233\1A

EDS CORPORATION
SERVICE LIST
October 6, 2003
Page 1

## *ATTORNEYS FOR PLAINTIFF(S):*

Mark C. Gardy
Michael M. Cohen
ABBEY GARDY, LLP
212 East 39th Street
New York, NY 10016
Tel:    (212) 889-3700
Fax:    (212) 684-5191
*Attorneys for Leif Thorne-Thomsen*

Jeffrey Abraham
ABRAHAM & ASSOCIATES
One Penn Plaza, Suite 1910
New York, NY 10119
*Executive Committee on behalf of ERISA
plaintiffs and the class*

James Baskin
THE BASKIN LAW FIRM
300 W. Sixth Street, Suite 1950
Austin, TX 78701
Tel:    (512) 381-6300
Fax:    (512) 322-9280
*Executive Committee on behalf of ERISA
plaintiffs and the class*

Sherrie R. Savett
Stuart J. Guber
Christopher L. Nelson
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel:    (215) 875-3000
Fax:    (215) 875-4604
*Attorneys for Stanton Discount Pharmacy*

Mel E. Lifshitz
Joseph R. Seidman, Jr.
BERNSTEIN, LIEBHARD
   & LIFSHITZ, LLP
10 East 40th Street
New York, NY 10016
Tel:    (212) 779-1414
Fax:    (212) 779-3218
*Attorneys for Henry Spitzer*

Joshua M. Lifshitz
BULL & LIFSHITZ, LLP
18 East 41st Street
New York, NY 10017
Tel:    (212) 213-6222
Fax:    (212) 213-9405
*Attorneys for Henry Spitzer and
Jennifer Chana Fink*

Paul J. Geller
CAULEY, GELLER, BOWMAN
   & COATES, LLP
One Boca Place
2255 Glades Road, Suite 421A
Boca Raton, FL 33431
Tel:    (561) 750-3000
Fax:    (561) 750-3364
*Attorneys for John Braun and Marc Abrams*

Randall K. Pulliam
CAULEY, GELLER, BOWMAN
   & COATES, LLP
11311 Arcade Drive, Suite 200
P.O. Box 25438
Little Rock, AR 72221-5438
Tel:    (501) 312-8500
Fax:    (501) 312-8505
*Attorneys for John Braun and Marc Abrams,
Haddon Zia*

EDS CORPORATION
SERVICE LIST
October 6, 2003
Page 2

Jeffrey W. Chambers
CHAMBERS LAW OFFICES
6440 N. Central Expressway, Suite 416
Dallas, TX 75206
Tel:    (214) 378-8133
Fax:    (214) 378-9316
*Attorneys for Stephen M. Harnik*

Martin D. Chitwood
Edward H. Nicholson, Jr.
Nikole M. Davenport
CHITWOOD & HARLEY
2300 Promenade II
1230 Peachtree Street, NE
Atlanta, GA 30309
Tel:    (404) 873-3900
Fax:    (404) 876-4476
*Attorneys for Glen W. Vanderwarter*

Robert J. Hill
CLAXTON & HILL, PLLC
3131 McKinney Avenue, Suite 700
Dallas, TX 75204
Tel:    (214) 969-9029
Fax:    (214) 953-0583
*Attorneys for Leif Thorne-Thomsen and
Barry Family, LP, William J. Kluemper and
Marshall Kwait*

Roger F. Claxton
CLAXTON & HILL, PLLC
700 McKinney Place
3131 McKinney Avenue, Suite 700
Dallas, TX 75204
Tel:    (214) 969-9029
Fax:    (214) 953-0583
*Attorneys for Leif Thorne-Thomsen and
Barry Family, LP, William J. Kluemper and
Marshall Kwait*

Herbert E. Milstein
Daniel S. Sommers
R. Joseph Barton
COHEN, MILSTEIN, HAUSFELD
    & TOLL, P.L.L.C.
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005
Tel:    (202) 408-4600
Fax:    (202) 408-4699
*Attorneys for Bridgewater Partners, LP*

Tom Alan Cunningham
CUNNINGHAM DARLOW ZOOK
    & CHAPOTON
1700 Chase Tower
600 Travis
Houston, TX 77002
Tel:    (713) 255-5500
Fax:    (713) 255-5555
*Attorneys for Glen W. Vanderwarter*

Robert J. Dyer III
Kip B. Shuman
DYER & SHUMAN, LLP
801 E. 17th Avenue
Denver, CO 80218
Tel:    (303) 861-3003
Fax:    (303) 830-6920
*Attorneys for Gregory R. Miller*

William B. Federman
FEDERMAN & SHERWOOD
2926 Maple Avenue, Suite 200
Dallas, TX 75201
Tel:    (214) 696-1100
Fax:    (214) 740-0112
*Attorneys for Glen W. Vanderwarter*

EDS CORPORATION
SERVICE LIST
October 6, 2003
Page 3

William B. Federman
FEDERMAN & SHERWOOD
120 N. Robinson Avenue, Suite 2720
Oklahoma City, OK 73102
Tel:     (405) 235-1560
Fax:     (405) 239-2112
*Attorneys for John Braun and Marc Abrams,*
*John J. Britt, Stanley Sved, Haddon Zia,*
*Jennifer Chana Fink*

Brian M. Felgoise
LAW OFFICES OF BRIAN FELGOISE
The Pavilion
261 Old York Road, Suite 423
Jenkintown, PA 19046
Tel:     (215) 886-1900
Fax:     none
*Attorneys for Stanley Sved*

Joel M. Fineberg
JOEL M. FINEBERG PC
3811 Turtle Creek Boulevard, Suite 1900
Dallas, TX 75219
Tel:     (214) 219-8828
Fax:     (214) 219-8838

Andrew J. Morganti
FINKELSTEIN, THOMPSON
    & LOUGHRAN
The Duvall Foundry
1050 30th Street, N.W.
Washington, DC 20007
Tel:     (202) 337-8000
Fax:     (202) 337-8090
*Attorneys for Stephen A. Goldberg*

Jack G. Fruchter
FRUCHTER & TWERSKY
One Pennsylvania Plaza – 49th Floor
New York, NY 10119
Tel:     (212) 687-6655
Fax:     (212) 279-3655
*Attorneys for Michael Feder*

Lionel Z. Glancy
Michael Goldberg
GLANCY & BINKOW LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Tel:     (310) 201-9150
Fax:     (310) 201-9160
*Attorneys for Barry Family, LP, William L.*
*Kluemper and Marshall Kwait*

Michael B. Himmel
Robert J. Kipnees
GREENBAUM, ROWE, SMITH,
    RAVIN, DAVIS & HIMMEL, LLP
P.O. Box 5600
Woodbridge, NJ 07095-0988
[fedex only] 99 Wood Avenue, South
Iselin, NJ 08830
Tel:     (732) 549-5600
Fax:     (732) 549-1881
*Lead Counsel for Lead Plaintiff New Jersey*
*and for the Securities Plaintiffs*

Deborah R. Gross
LAW OFFICES OF
    BERNARD M. GROSS, P.C.
1515 Locust Street, Second Floor
Philadelphia, PA 19102
Tel:     (215) 561-3600
Fax:     (215) 561-3000
*Attorneys for Mayer Horwitz and*
*Barbara Horwitz*

EDS CORPORATION
SERVICE LIST
October 6, 2003
Page 4

Lynn L. Sarko
KELLER ROHRBACK, L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel:    (206) 623-1900
Fax:    (206) 623-3384
*Attorneys for Jeffrey Smith and Executive
Committee on behalf of ERISA plaintiffs and
the class*

Leigh R. Lasky
LASKY & RIFKIND, LTD.
351 W. Hubbard, Suite 406
Chicago, IL 60610
Tel:    (312) 634-0057
Fax:    (312) 634-0059
*Attorneys for Barry Family, LP and
Marshall Kwait*

Marc S. Henzel
LAW OFFICES OF MARC S. HENZEL
273 Montgomery Avenue, Suite 202
Bala Cynwyd, PA 19004-2808
Tel:    (610) 660-8000
Fax:    (610) 660-8080
*Attorneys for Stanley Sved*

Stephen G. Levy
LEVY and LEVY, P.C.
One Stamford Plaza
263 Tresser Boulevard, 9th Floor
Stamford, CT 06901
Tel:    (203) 564-1920
Fax:    (203) 564-1402

Richard A. Lockridge
Karen M. Hanson
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue, South, Suite 2200
Minneapolis, MN 55401
Tel:    (612) 339-6900
Fax:    (612) 339-0981
*Attorneys for Haddon Zia*

Christopher Lovell
Frederick W. Gerkens, III
Christopher J. Gray
LOVELL STEWART HALEBIAN LLP
500 Fifth Avenue, Suite 5800
New York, NY 10110
Tel:    (212) 608-1900
Fax:    (212) 719-4677
*Attorneys for Jennifer J. Fadem, Ann S.
Hanes, Stanley Kleinman, M.D., Charles H.
Walsh and Kenneth Zuman, and Stephen A.
Goldberg*

Ann D. White
Jayne Arnold Goldstein
MAGER WHITE & GOLDSTEIN, LLP
165 Township Line
Jenkintown, PA 19046
Tel:    (215) 481-0273
Fax:    (215) 481-0271
*Attorneys for Mark Jacobson, D.O.*

Mark McNair
LAW OFFICES OF MARK McNAIR
1101 30th Street, NW, Suite 500
Washington, DC 20007
Tel:    (202) 872-4717
Fax:    (202) 872-4718
*Attorneys for Glen W. Vanderwarter*

EDS CORPORATION
SERVICE LIST
October 6, 2003
Page 5

Steven G. Schulman
Samuel H. Rudman
MILBERG WEISS BERSHAD
    HYNES & LERACH LLP
One Pennyslvania Plaza – 49th Floor
New York, NY 10119
Tel:    (212) 594-5300
Fax:    (212) 868-1229
*Attorneys for Michael Feder,*
*Craig Thompson*

Darren J. Robbins
MILBERG WEISS BERSHAD
    HYNES & LERACH LLP
401 B Street, Suite 1700
San Diego, CA 92101
Tel:    (619) 231-1058
Fax:    (619) 231-7423
*Attorneys for Michael Feder,*
*Craig Thompson*

Carol V. Gilden
Michael E. Moskovitz
Louis A. Kessler
MUCH SHELIST FREED DENENBERG
    AMENT & RUBINSTEIN, P.C.
191 North Wacker Drive, Suite 1800
Chicago, IL 60606
Tel:    (312) 521-2000
Fax:    (312) 521-2100
*Attorneys for Mayer Horwitz and*
*Barbara Horwitz*

Paul D. Flack
NICKENS, KEETON, LAWLESS,
    FARRELL & FLACK L.L.P.
600 Travis, Suite 7500
Houston, TX 77002
Tel:    (713) 571-9191
Fax:    (713) 571-9652
*Liaison Counsel for Lead Plaintiff New*
*Jersey and for the Securities Plaintiffs*

Diane Nygaard
THE NYGAARD LAW FIRM
Two Emanuel Cleaver II Boulevard,
    Suite 150
Kansas City, MO 64112
Tel:    (816) 531-3100
Fax:    (816) 531-3600
*Attorneys for Gregory R. Miller*

James Orman
LAW OFFICES OF JAMES M. ORMAN
1845 Walnut Street, 14th Floor
Philadelphia, PA 19103
Tel:    (215) 523-7800
Fax:    (215) 523-9290
*Attorneys for Stanton Discount Pharmacy*

Charles J. Piven
LAW OFFICES OF
    CHARLES J. PIVEN, P.A.
The World Trade Center – Baltimore
401 East Pratt Street, Suite 2525
Baltimore, MD 21202
Tel:    (410) 332-0030
Fax:    (410) 685-1300
*Attorneys for John J. Britt, Jr.*

EDS CORPORATION
SERVICE LIST
October 6, 2003
Page 6

Elton Joe Kendall
Debbie Branscum
Karl Rupp
PROVOST UMPHREY LAW FIRM L.L.P.
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
Tel:    (214) 744-3000
Fax:    (214) 744-3015
*Attorneys for Michael Feder, Gregory R.
Miller, Craig Thompson*

Robert A. Izard
SCHATZ & NOBEL, P.C.
330 Main Street, Second Floor
Hartford, CT 06106
Tel:    (860) 493-6292
Fax:    (860) 493-6290
*Attorneys for Larry Florer and Executive
Committee on behalf of ERISA plaintiffs and
the class*

Richard S. Schiffrin
Marc A. Topaz
Darren J. Check
Sean M. Handler
SCHIFFRIN & BARROWAY, LLP
Three Bala Plaza East, Suite 400
Bala Cynwyd, PA 19004
Tel:    (610) 667-7706
Fax:    (610) 667-7056
*Attorneys for John Braun and Marc Abrams
and Richard Langbecker*

Roger B. Greenberg
SCHWARTZ, JUNELL, CAMPBELL
   & OATHOUT, LLP
Two Houston Center
909 Fannin, Suite 2000
Houston, TX 77010
Tel:    (713) 752-0017
Fax:    (713) 752-0327
*Attorneys for Steven M. Harnik and
Mark Jacobson, D.O.*

Robert M. Roseman
David Felderman
SPECTOR, ROSEMAN & KODROFF, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel:    (215) 496-0300
Fax:    (215) 496-6611
*Attorneys for John McLoughlin*

Jules Brody
Tzivia Brody
Aaron Lee Brody
STULL, STULL & BRODY
6 East 45th Street
New York, NY 10017
Tel:    (212) 687-7230
Fax:    (212) 490-2022
*Attorneys for Samuel Zaks, and
Vladimir Spira, M.D.*

Jay M. Vogelson
STUTZMAN, BROMBERG, ESSERMAN
   & PLIFKA, P.C.
2323 Bryan Street, Suite 2200
Dallas, TX 75201
Tel:    (214) 969-4900
Fax:    (214) 969-4999
*Attorneys for Jennifer J. Fadem and
Ann S. Hanes*

EDS CORPORATION
SERVICE LIST
October 6, 2003
Page 7

Barry C. Barnett
SUSMAN GODFREY L.L.P.
901 Main Street, Suite 4100
Dallas, TX 75202-3775
Tel:    (214) 754-1900
Fax:    (214) 754-1933
*Attorneys for Stanton Discount Pharmacy,*
*Douglas B. Vanderlip and Lead and Liaison*
*Counsel on behalf of the ERISA plaintiffs*
*and the class*

Robert C. Susser
ROBERT C. SUSSER, P.C.
6 East 43rd Street, Suite 1900
New York, NY 10017
Tel:    (212) 808-0298
Fax:    (212) 949-0966
*Attorneys for William J. Kluemper*

Curtis V. Trinko
LAW OFFICES OF
    CURTIS V. TRINKO LLP
16 West 46th Street, 7th Floor
New York, NY 10036
Tel:    (212) 490-9550
Fax:    (212) 986-0158
*Attorneys for Leif Thorne-Thomsen*

Joseph H. Weiss
Moshe Balsam
WEISS & YOURMAN
551 Fifth Avenue
New York, NY 10176
Tel:    (212) 682-3025
Fax:    (212) 682-3010
*Attorneys for Samuel Zaks, and*
*Vladimir Spira, M.D.*

Grace A. Weatherly
WOOD THACKER & WEATHERLY, P.C.
400 North Carroll Boulevard, Suite 202
Denton, TX 76201
Tel:    (940) 565-6565
Fax:    (940) 566-6673
*Attorneys for Bridgewater Partners, LP and*
*John McLoughlin*

Fred Taylor Isquith
WOLF HALDENSTEIN ADLER
    FREEMAN & HERZ, LLP
270 Madison Avenue
New York, NY 10016
Tel:    (212) 545-4600
Fax:    (212) 545-4677
*Attorneys for John J. Britt, Jr.*

Robert C. Finkel
Marian P. Rosner
Michael A. Schwartz
Ken H. Chang
WOLF POPPER LLP
845 Third Avenue
New York, NY 10022
Tel:    (212) 759-4600
Fax:    (212) 486-2093
*Attorneys for Stephen M. Harnik*

Alfred G. Yates, Jr.
LAW OFFICES OF
    ALFRED G. YATES, JR.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219-1649
Tel:    (412) 391-5164
Fax:    (412) 471-1033
*Attorneys for Craig Thompson*

EDS CORPORATION
SERVICE LIST
October 6, 2003
Page 8

## *ATTORNEYS FOR DEFENDANTS:*

G. Irvin Terrell
Samuel Cooper
*BAKER BOTTS L.L.P.
3000 One Shell Plaza
910 Louisiana
Houston, TX 77002
Tel:     (713) 229-1234
Fax:     (713) 229-1522
*Attorneys for Defendants Electronic Data
Systems, Richard H. Brown, Paul J.
Chiapparone, James E. Daley, Jeffrey M.
Heller, John A. Adams, Michael Milton,
James A. Baker, III, Roger A. Enrico,
William H. Gray, III, Ray J. Groves, Ray L.
Hunt, C. Robert Kidder, and Judith Rodin*

Larry Carlson
Steven Schortgen
Aaron Davidson
*BAKER BOTTS L.L.P.
2001 Ross Avenue
Dallas, TX 75201
Tel:     (214) 953-6500
Fax:     (214) 953-6798
*Attorneys for Defendants Electronic Data
Systems, Richard H. Brown, Paul J.
Chiapparone, James E. Daley, Jeffrey M.
Heller, John A. Adams, Michael Milton,
James A. Baker, III, Roger A. Enrico,
William H. Gray, III, Ray J. Groves, Ray L.
Hunt, C. Robert Kidder, and Judith Rodin*

*Denotes service via FedEx.

Robert Rachal
Howard Shapiro
*SHOOK, HARDY & BACON, L.L.P.
LL&E Tower
909 Poydras Street, Suite 1100
New Orleans, LA 70112-4017
Tel:     (504) 310-4088
Fax:     (504) 522-5771
*Attorneys for Defendants Electronic Data
Systems, Richard H. Brown, Paul J.
Chiapparone, James E. Daley, Jeffrey M.
Heller, John A. Adams, Michael Milton,
James A. Baker, III, Roger A. Enrico,
William H. Gray, III, Ray J. Groves, Ray L.
Hunt, C. Robert Kidder, and Judith Rodin*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| IN RE ELECTRONIC DATA SYSTEMS CORPORATION SECURITIES LITIGATION | CASE NO. 6:03-MD-1512 LEAD CASE 6:03-CV-110 ("SECURITIES") |
| THIS DOCUMENT RELATES TO: | |
| ALL CASES | |

[PROPOSED] ORDER DENYING
DEFENDANTS' MOTION TO DISMISS

Case 6:03-cv-00110-LED    Document 56    Filed 10/06/2003    Page 56 of 56

On this ___ day of _____, 2003 this Court heard Defendants' Motion to Dismiss. Upon consideration of the pleadings and arguments of the parties, this Court is of the opinion that the Motion should be DENIED.

IT IS HEREBY ORDERED THAT:

Defendants' Motion to Dismiss is DENIED.

So ORDERED and SIGNED this _____ day of _____, 2003.


_____
HONORABLE LEONARD DAVIS
UNITED STATES DISTRICT COURT JUDGE


::ODMA\PCDOCS\BLBGCA\11540\1

-1-